**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA – ORLANDO DIVISION**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> GOLIATH VENTURES INC. and CHRISTOPHER DELGADO <br><br> Defendants. | Civil Action No. 6:26-cv-1737 |

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF, AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS**

Plaintiff Commodity Futures Trading Commission ("Commission"), by and through its attorneys, alleges as follows:

### I.    SUMMARY

1.    From at least November 3, 2022, through at least February 17, 2026 (the "Relevant Period"), Christopher Delgado ("Delgado") and his company Goliath Ventures Inc. ("Goliath") (collectively, "Defendants") engaged in a Ponzi scheme by fraudulently soliciting and accepting funds from members of the public ("customers") and falsely representing that Goliath would place those funds in crypto asset liquidity pools on decentralized exchanges, where the

funds would be used to facilitate trading in crypto assets, including bitcoin and ether. Defendants, however, deployed no customer funds to crypto asset liquidity pools. Instead, Defendants used contributions from new customers to pay purported profits to existing customers, return initial contributions to other customers, pay commissions to Goliath personnel who solicited new customers, and fund Delgado's lavish lifestyle.

2. In furtherance of their scheme, Defendants falsely guaranteed the return of principal investments and/or profits, and they went to great lengths to portray their business as legitimate and successful. Defendants, for example, regularly held extravagant events and publicized extensive, purported charitable giving. They also circulated sham audit reports falsely claiming that customer funds were safe, and they issued fabricated account statements reflecting nonexistent profits. In response to these fraudulent representations and activities, approximately 1,611 customers contributed at least $397 million to Goliath.

3. By this conduct and the further conduct described herein, Defendants—either directly, as principals, or as controlling persons—violated Section 6(c)(1) of the Commodity Exchange Act ("Act"), 7 U.S.C. § 9(1), and Commission Regulation ("Regulation") 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2025).

4.     Unless restrained and enjoined by this Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

5.     The Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act and Regulations.  The Commission also seeks civil monetary penalties, restitution, disgorgement, trading and registration bans, pre- and post-judgment interest, and such other equitable and ancillary relief as this Court may deem necessary and appropriate.

## II.   JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive and other relief against any person whenever it appears to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder, and provides that U.S. district courts "shall have jurisdiction to entertain such actions."

7.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this district.  In addition, during the Relevant Period, one or more Defendants resided in this District.

### III.    THE PARTIES

8.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and Regulations.

9.     Defendant **Goliath Ventures Inc.** was incorporated in Florida in 2019, began doing business under its current name in September 2021, and remained a Florida corporation with its principal place of business in Sunrise, Florida until in or around September 2025.  At that time, Goliath reincorporated in Wyoming with its principal place of business in Orlando, Florida.  Goliath has never been registered with the Commission.

10.     Defendant **Christopher Delgado** is a Florida resident and the Founder, President, and Chief Executive Officer of Goliath.  In June 2026, Delgado pleaded guilty to federal criminal charges for his role in the fraud described herein.  Delgado has never been registered with the Commission.

4

## IV.    FACTS

### A.    Defendants Fraudulently Solicited Customers to Contribute to Liquidity Pools.

11.    During the Relevant Period, Defendants fraudulently solicited customers to purchase or contribute various crypto asset commodities, including bitcoin and ether, which Goliath would then purportedly use to participate in liquidity pools on certain decentralized exchanges.  Defendants claimed that they earned fees by supplying liquidity to facilitate crypto asset trading, and they represented that those fees would fund customer returns.  Defendants, for example, told customers that they provided liquidity on a decentralized finance exchange ("DeFi Exchange 1") that allowed users to swap, lend, or borrow crypto assets, and that DeFi Exchange 1 paid liquidity providers for providing crypto assets to various liquidity pools.  Defendants, however, did not tell their customers that providing such liquidity carried significant risk of loss that might not be offset by potential fees earned.

12.    To provide the illusion of sophisticated management of customer funds, Goliath published on its website numerous articles purporting to educate the public regarding liquidity pools, and it falsely claimed that it had a successful track record of deploying customer funds to liquidity pools profitably.

13.    Defendants repeatedly marketed liquidity pools as a centerpiece of their business.  In a presentation created on or about March 5, 2025, and later

5

provided to customers, Goliath wrote that its "participation in liquidity pools enables seamless trading" and that it was "positioned at the forefront of . . . DeFi . . . ."  In this presentation, Goliath explained how participation in liquidity pools could generate "ongoing passive income" as customers would "earn a share of transaction fees and potential liquidity rewards."  Defendants knew that these representations were false because Delgado (as Goliath's CEO with visibility into and control over Goliath's finances and activities) knew that Goliath was not participating in liquidity pools as promised.

14.    In addition, Defendants falsely claimed that Goliath's participation in liquidity pools would be safe and profitable.  In a 2023 slide deck, Goliath pitched itself as a "large Liquidity Provider" in DeFi liquidity pools and claimed that its liquidity pool contributions were a "wealth generating opportunity" that could provide "Instant Cashflow" and/or a "Nest Egg" through "3% Monthly" ("36% Annual[]") returns.  With such promised returns, customers could opt for a 3% monthly payout or to "Hyper Compound" those promised earnings by reinvesting them.

15.    In Joint Venture Agreements ("JVAs") with customers, Defendants also promised guaranteed return of principal and, in some cases, guaranteed profits.  For example, in a July 18, 2024 JVA, Defendants "guarantee[d] [return

of] the [customer's] principal" as well as "guaranteed monthly profits" of up to 5% on ether and bitcoin, among other assets, contributed to liquidity pools.

16.    To further perpetuate the illusion that it was a successful, legitimate business, Goliath held regular, extravagant events to which customers were invited.  In December 2024, Goliath held its "annual Christmas party," which was replete with hired performers and lavish entertainment, and in December 2025, Goliath hosted an extravagant "Casino Royale" Christmas party at a luxury resort in Orlando, Florida.

17.    Defendants also publicized Goliath's purported charitable giving. For example, in a January 2025 newsletter, Goliath described its charitable giving during the prior year, noting that "[g]iving back is not just part of our culture-it's a reflection of the heart and purpose that drives us every day."   Similarly, during the Relevant Period, Goliath's website stated that Goliath was "proud to support both local and international charities, communities, and schools," claimed it "has donated over $1 million over the past year . . . and more than $4 million" since 2019, and listed nine purported recipients of Goliath's giving. Defendants intended these communications to paint Goliath as a successful, legitimate company, which it was not, and to convince prospective and actual customers to contribute funds and/or remain with Goliath.

**B.    Defendants Misrepresented Goliath's Compliance
Efforts and Issued False Audit Reports and Account**

7

**Statements to Assure Customers and Prospective Customers.**

18.    To contribute to the illusion that Goliath was a legitimate and compliant business, in January 2025, Defendants announced a new partnership with a "regulatory and compliance firm" ("Firm 1"), which was owned and controlled by Goliath's "Head of Compliance" (and supervisor of Goliath Directors responsible for soliciting new customers), asserting that "[s]taying up to date with regulations and compliance within our industry is not just a necessity but a responsibility we take seriously."

19.    Defendants repeatedly touted Goliath's engagement of Firm 1 throughout the Relevant Period.  For example, in a letter signed by Delgado, Goliath noted that Firm 1 would "oversee compliance efforts at Goliath and support day-to-day operations," and that Firm 1 would "work closely with the Goliath team to make sure that [customer] agreement[s] anticipate[d] future relevant regulations as closely as possible."

20.    Defendants circulated sham audit results to existing and potential customers to convince them Goliath was legitimate.  Following a purported audit of Goliath's business culminating on or about February 15, 2025, Firm 1 wrote a letter to Goliath customers, providing that: (1) "It is our opinion that despite strong returns, the approach to liquidity pool risk by [Goliath] is conservative"; (2) Goliath "maintained an average balance of at least 115% of partner funds at

all times during the review period"; and (3) Goliath "maintains positions in cash or cash equivalents (USDC, USDT) to satisfy all partner requests for withdrawal or distribution."  Defendants knew that these statements were false, as Goliath was not participating in liquidity pools at all and, as detailed below, Defendants were extensively misappropriating customer funds.

21.     On or about August 13, 2025, Firm 1 issued an "Independent Evaluation Report" of Goliath's operations making similar false claims.  Firm 1 claimed it engaged in a "comprehensive review of all [Goliath] relevant financial statements and records."  Firm 1 stated that "Goliath . . . was in receipt of 100% or more of all partner balances during the review period," and that its evaluation confirmed "[Goliath's] ability to satisfy all partner distribution and withdrawal requests, including and up to 100% of their balance, at all times."  Firm 1 further stated that Goliath's "liquidity pool (LP) approach is a direct correlation to its conservative, risk-based methodology."  Defendants knew that these statements were false, as Goliath was not participating in liquidity pools as promised, and Defendants were extensively misappropriating funds.

22.     Goliath also issued false account statements to mislead customers regarding their account balances.  Goliath sent monthly statements and maintained an online portal for customer access, falsely depicting inflated

account balances and nonexistent returns from supposed liquidity pool participation.

23. In response to Goliath's fraudulent representations and activities, customers contributed at least approximately $397 million to Goliath.

**C.   Goliath Engaged in a Ponzi Scheme and Misappropriated All Customer Funds.**

24. A Ponzi scheme is a fraudulent scheme where fraudsters falsely promise to use customer money for some purpose (*e.g.*, to invest in a particular market and pay out profits from those investments) and instead use new customer money to pay existing customers in order to conceal and continue to perpetrate fraud.

25. Goliath engaged in a Ponzi scheme.  Goliath deployed no customer funds to liquidity pools.  By disposing of customer funds other than as promised, Defendants misappropriated all customer funds.

26. To this end, Delgado misappropriated at least approximately $48 million of customer money for his personal use, including to purchase luxury homes, vehicles, jewelry, and other luxury goods.

27. For example, between approximately August 28, 2025 and September 2, 2025, multiple Goliath customers transferred a total of over $1.3 million to a Goliath bank account.  On or about September 2, 2025, Defendants transferred approximately $1 million from that Goliath bank account to an

account in the name of an LLC controlled by Delgado.  On or about September 19, 2025, Delgado transferred approximately $838,000 from the LLC account to a third party to purchase a yacht.

28.    In addition, Defendants used corporate credit cards to spend at least $21 million of additional customer money, including over $4.9 million on world travel; $2.9 million on luxury apparel, jewelry, and travel concierge services; and over $400,000 on school tuition, soccer expenses, and educational tutoring for Delgado's children as well as pet grooming.

29.    Separately, Defendants used customer funds to make Ponzi payments to other customers—*i.e.*, to pay supposed returns from non-existent liquidity pool participation and/or to return initial principal to customers requesting payouts.  For example, on or about October 17, 2025, Goliath received approximately $1.1 million from five customers.  Instead of using those funds to participate in liquidity pools as promised, that same day, Defendants paid out just over $1.1 million from that same bank account to seven separate customers. In total, Defendants used customer funds to make at least approximately $87 million in Ponzi payments to other customers.

30.    Defendants also transferred at least approximately $174 million in customer funds to various Goliath Directors and staff (often in the form of commissions for recruiting customers).

11

31.     As a result of Defendants' conduct, customers suffered hundreds of millions of dollars in losses.

### D.     Defendants Attempted to Cover Up Their Fraud by Making Further Misrepresentations.

32.     By at least September 2025, an investigative journalist ("Journalist 1") began publicly alleging that Goliath was a Ponzi scheme.  In response, Goliath's attorneys sent a September 9, 2025 cease-and-desist letter to Journalist 1, threatening to sue Journalist 1 for defamation and falsely stating that "Goliath is and has always been a legitimate company, and not a Ponzi scheme."  In the same letter, Goliath's attorneys stated that "Goliath and Mr. Delgado have complied with every applicable law and have never taken money from new investors and paying *[sic]* old investors using new money coming in."

33.     On September 22, 2025, Goliath sued Journalist 1 for defamation. The complaint repeatedly denied that Goliath was a Ponzi scheme and disputed allegations that certain features of Goliath's business, such as guaranteed return of principal, were indicative of fraud:  "[T]he contractual language is both lawful and transparent . . . . Goliath's guarantee of principal is backed by legitimate business practices and further reinforced by fidelity bond coverage designed to protect against loss."

34.     Defendants knew the foregoing statements in the cease-and-desist letter and complaint were false when made.

35.   By at least November 2025, Goliath began communicating to customers that payouts would be delayed.  For example, in a November 17, 2025 email, Defendants told customers:

> At Goliath Ventures, transparency and trust are the cornerstones of our operations in the dynamic world of decentralized finance. We are thrilled to share a significant milestone in our commitment to these principles: our third-party audit, conducted by a leading Forensic Certified Public Accountant firm, is progressing steadily toward completion.
>
> This rigorous independent review, initiated at the request of our esteemed participants, serves as a powerful testament to the integrity and success of our liquidity provision strategies. By engaging top forensic experts, we are not only validating our day-to-day liquidity strategy but also providing irrefutable proof that your allocations are fueling genuine growth, free from any concerns. The audit will culminate in a comprehensive certified report, shared with all participants, reinforcing the robust health of our fund and empowering you with full visibility into our operations.
>
> **Important Note for October Distributions:**
>
> To ensure the audit's thoroughness and accuracy, and to have the audit completed before the end of the year, the audit team in conjunction with legal, has recommended a brief adjustment to our monthly distribution strategy. This adjustment means temporarily halting operations and as a result your monthly distribution will be slightly delayed.  Goliath is working as quickly as possible to complete this phase of the audit and resume normal business flow. We are not in a position to advise as to the exact length of the payout delay, but rest assured you will receive your monthly distribution as planned. You will receive additional communication as this step is completed, and distributions have resumed.
>
> This pause in outgoing direct distributions allows our auditors unrestricted access to trace every movement of funds, delivering the gold-standard verification you deserve. This is the only way this

13

audit can be completed, which will scrutinize every transaction Goliath has made since the company's inception. Taking us "offline" ensures the safety of the Participant's contributions and compounding, as going offline ensures no sensitive data is compromised in any way. Allowing the auditors unfettered access can only be accomplished in a very strict and controlled way. The benefits are clear: enhanced credibility, fortified risk management, and a stronger foundation for continued success. In short, this step safeguards your deposits today while amplifying opportunities tomorrow.

36. Multiple statements in this email were false. Goliath was not deploying any "liquidity provision strategies" and was not undergoing an audit. Rather, Goliath delayed payouts because, after failing to deploy customer funds as promised and misappropriating millions of dollars in customer funds, Goliath lacked the funds to continue making Ponzi payments to customers requesting payouts.

37. On December 3, 2025, Goliath sent another email, signed by Delgado, making additional false excuses for delayed payouts and promising near-term payments:

First, the headline you've been waiting for: we're fully back to our regular rhythm, and the December 15–18 cycle will include everything owed to you, October catch-ups, November payouts and everything moving forward on the normal schedule. We're genuinely sorry that a portion of the October distribution didn't land in November as it should have. You count on us to be predictable and on time, and we fell short of that standard last month.

14

Goliath falsely cited "additional compliance and forensic accounting requirements that had to be completed before [it] could release funds."  Goliath assured customers it would resume monthly payouts on the regular schedule.

38.    On December 18, 2025, Goliath sent another email to customers, signed by Delgado, making additional fraudulent pretextual excuses for delayed payouts to customers.  Goliath, for example, stated that the scale of its operations placed it under "heightened institutional and compliance review" and claimed that the previous month's delay in making payments to customers was driven by "audit-driven recommendations to temporarily limit transactional volume while specific operational controls and reporting standards were finalized."  Goliath asserted that the delay in making payments to customers was "administrative in nature" and "inherent in coordinating legacy banking systems with blockchain-based operations as institutional banking arrangements [were] finalized."  Goliath also stated that "[t]hese timing adjustments [were] infrastructure-related and [did] not reflect liquidity constraints, performance issues, or the underlying strength of Goliath's business model."  Goliath claimed that an "inflow of new participants" was not necessary to "sustain activity" and linked to an article describing liquidity provisioning as a legitimate fee-generating activity.

15

39.     Defendants knew the foregoing excuses and explanations for delayed payouts to customers were false at the time they made these representations to customers.

### E.     Goliath Ceases Operations.

40.     On January 28, 2026, Delgado emailed the Goliath Directors, writing: "Effective immediately, please discontinue all communications with new/interested partners regarding joint venture (JV) partnerships involving Goliath Ventures Inc.  Additionally, Goliath Ventures Inc. will suspend all new/interested investments and contributions from current [customers].  It is critical that no new investments be made to Goliath Ventures Inc. at this time."

41.     On February 17, 2026, Delgado emailed Goliath Directors again, writing: "Effective immediately, Goliath . . . is ceasing all operations.  Please discontinue any and all communications with partners and, from this point on, do not provide any additional updates to the internal partner dashboard.  Team members should no longer provide updates on behalf of Goliath or respond to any 'status update requests' from partners."

**F.    Delgado Pleads Guilty to Federal Criminal Charges in Connection with the Goliath Fraudulent Ponzi Scheme.**

42.    On February 20, 2026, federal authorities charged Delgado criminally with wire fraud and money laundering for his role in the fraud described herein.

43.    The Affidavit supporting the Criminal Complaint filed against Delgado alleged Delgado directed the Goliath Ponzi scheme and extensively misappropriated customer funds, for example by using victim funds to purchase real property worth at least $14.5 million.

44.    The court in the Delgado's criminal case enjoined Delgado from selling 52 luxury personal items, including vehicles and jewelry, based on allegations they were purchased using proceeds from the conduct giving rise to the charged offenses.

45.    In June 2026, Delgado pleaded guilty to federal criminal charges of conspiracy to commit wire fraud, wire fraud, and money laundering in connection with the Goliath fraudulent Ponzi scheme, admitting to orchestrating the fraud described herein and using millions of dollars of customer funds for his own lavish personal spending.

17

G.    **Goliath Filed for Bankruptcy in March 2026.**

46.    On February 2025, a customer sued Goliath in Florida state court relating to the conduct described herein.  *See Mehal Patel v. Goliath Ventures Inc.*, Case No. CACE-26-003310 (17th Jud. Cir., Broward Co.).  On March 3, 2026, the court issued an order appointing and authorizing a receiver to file for bankruptcy on Goliath's behalf.  On March 16, 2026, the receiver filed for bankruptcy on Goliath's behalf.  *See In Re: Goliath Ventures, Inc.*, No. 1:26bk13174 (Bankr. S.D. Fla.).  The bankruptcy matter is ongoing.

H.    **Delgado Controlled Goliath.**

47.    During the Relevant Period, Delgado was a controlling person for Goliath.  Delgado is the Founder, President, and Chief Executive Officer of Goliath.  Goliath's website listed Delgado as the "Founder and CEO of Goliath Ventures" and stated that Goliath "is led by Chris Delgado, an international business investor."  Delgado was the sole signatory for multiple relevant Goliath bank accounts, including the bank account that accepted the majority of customer funds, and was the sole contact listed in account records for Goliath's principal crypto exchange wallet.  Delgado signed JVAs on Goliath's behalf.  In his plea agreement, Delgado admitted that he held ultimate control over Goliath's finances and business decisions.  Delgado did not act in good faith or knowingly induced Goliath's fraudulent acts.

18

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2025) Fraud by Deceptive Device or Contrivance**

**(All Defendants)**

48.    Paragraphs 1 through 47 of this Complaint are incorporated as if separately alleged herein.

49.    7 U.S.C. § 9(1) makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . .

50.    17 C.F.R. § 180.1(a)(1)-(3) (2025) provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1)    Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2)    Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or

19

misleading; [or]

(3)    Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person[.]

51.    The crypto assets at issue in this complaint, including bitcoin and ether, are commodities pursuant to Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

52.    During the Relevant Period, in connection with a contract of sale of any commodity in interstate commerce, Defendants intentionally or recklessly: (i) used or employed, or attempted to use or employ, manipulative or deceptive devices or contrivances; (ii) made or attempted to make untrue or misleading statements of material fact or omitted to state a material fact; and/or (iii) engaged or attempted to engage in an act, practice, or course of business, which operated or would operate as a fraud or deceit upon any person, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2025), by making material misrepresentations, omitting and failing to disclose material facts, and engaging in acts of misappropriation, including but not limited to:

a.    falsely promising to use customer funds to participate in liquidity pools;

b.    falsely representing that Goliath guaranteed return of customer principal and/or guaranteed profits;

c.    distributing sham audit reports to customers stating that Goliath was deploying assets to liquidity pools in a responsible way that protected customer principal;

20

     d.     communicating false account values to customers through false account statements and Goliath's customer portal; and

     e.     misappropriating customer funds by using those funds for Delgado's personal use, making Ponzi payments to customers, and making payments to Goliath personnel who successfully recruited customers to the Goliath Ponzi scheme.

53.     Each material misrepresentation, material omission, or act of misappropriation made by Defendants is a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2025).

54.     The foregoing acts, omissions, and failures by Delgado occurred within the scope of his employment, agency, or office with Goliath during the Relevant Period.  Therefore, Goliath is liable for Delgado's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2025), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2025).

55.     Delgado held and exercised direct and indirect control over Goliath and either did not act in good faith or knowingly induced Goliath's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2025) during the Relevant Period. As a controlling person of Goliath, Delgado is liable for Goliath's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2025) pursuant to 7 U.S.C. § 13c(b).

## VI.   RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c(a) of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A. Enter an order finding that Defendants violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2025);

B. Enter an order of permanent injunction restraining, enjoining and prohibiting Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and any other person or entity in active concert with them, from engaging in conduct in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2025);

C. Enter an order of permanent injunction prohibiting Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and any other person or entity in active concert with them from, directly or indirectly:

   1) Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

   2) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2025)),

22

for accounts held in the name of Defendants or for accounts in which Defendants have a direct or indirect interest;

3) Having any commodity interests traded on Defendants' behalf;

4) Controlling or directing the trading for, or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6) Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2025); and

7) Acting as a principal (as that term is defined in Regulation 3.1, 17 C.F.R. § 3.1 (2025)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9) (2025);

D. Enter an order requiring Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such

23

procedures as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

E.  Enter an order requiring Defendants, as well as any third-party transferee and/or successors thereof, to make full restitution, pursuant to such procedures as the Court may order, to every person or entity who sustained losses proximately caused by Defendants' violations described herein, including pre-judgment and post-judgment interest;

F.  Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the participants whose funds were received by Defendants as a result of the acts and practices that constituted violations of the Act and Regulations, as described herein;

G.  Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty

prescribed by 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* 17 C.F.R. § 143.8 (2025), for each violation of the Act and Regulations, as described herein, plus post-judgment interest;

H. Enter an order directing that Defendants, and any third-party transferee and/or successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to participants and other persons in connection with commodity interests and all disbursements for any purpose whatsoever of funds received from commodity interests, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least November 3, 2022 to the date of such accounting;

I. Enter an order requiring Defendants, and any third-party transferee and/or successors thereof, to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2); and

J. Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

25

Dated:  August 11, 2026                    Respectfully submitted,

                                           **COMMODITY FUTURES TRADING COMMISSION**

                                           By: */s Kelly Folks*
                                               Kelly Folks, Va. Bar No. 72124
                                               kfolks@cftc.gov
                                               Anthony C. Biagioli, Mo. Bar No. 72434
                                               abiagioli@cftc.gov (Lead Counsel)
                                               Daniel Jordan, Va. Bar No. 36382
                                               djordan@cftc.gov
                                               Three Lafayette Centre
                                               1155 21st Street, NW
                                               Washington, DC 20581
                                               (202) 418-5000

                                               Attorneys for Plaintiff Commodity
                                               Futures Trading Commission

26